## S99P1418. CARRUTHERS v. THE STATE.
(528 SE2d 217)

FLETCHER, Presiding Justice.

Anthony Carruthers was convicted of the malice murder of Jannette Williams and sentenced to death.[1] Carruthers contends that

---

[1] The crimes occurred on December 12 and 13, 1995. Carruthers was indicted by a Clayton County grand jury on October 2, 1996, for malice murder, two counts of felony murder,

the assistant district attorney made several improper arguments that warrant reversal of the death sentence. Finding no reversible error in the guilt/innocence phase of Carruthers' trial, we affirm the jury's verdict of guilt on all charges. However, because we conclude that the trial court erred in allowing the state to urge the jury to follow the religious mandates of the Bible rather than Georgia law, we reverse the sentence of death and remand the case for another jury to consider the proper sentence for the murder.

1. The evidence at trial showed that on December 12, 1995, Williams picked up Carruthers and Billy Edward Easter, Jr., at Carruthers' residence, drove the men to her residence, and invited them in. After some friendly conversation, she sat on Carruthers' lap. When Carruthers whispered something in her ear, Williams responded that she had a boyfriend. Carruthers then grabbed her arm. Easter went upstairs to use the bathroom. When he heard the sound of breaking glass, he returned downstairs and saw Carruthers choking Williams. She fell to the floor unconscious or semi-conscious. Carruthers cut her throat with one knife and then threw it across the room, commenting that it was dull. As Williams showed signs of life, Carruthers obtained a larger knife from the kitchen and cut her neck in a repetitive motion, cutting most of the way through her neck. He then rolled her over and stabbed her eleven times in the chest.

Shortly after the murder, Carruthers' girlfriend observed Williams' automobile parked outside Carruthers' residence, his bloody clothes in his washing machine, and scratches on his neck. Carruthers and Easter drove to Florida in Williams' car where Carruthers sold it for illegal drugs, and, upon discovering that the drugs were fake, chased and possibly shot at a man involved in the transaction. After returning to Georgia, Carruthers confessed to his girlfriend that he had killed a woman who owed him money. On December 20, 1995, Williams' automobile was discovered in Florida. Blood with

---

possession of a knife during the commission of a crime against the person of another, theft by taking a motor vehicle, and possession of a firearm during the commission of the theft of a motor vehicle. The state filed notice of its intent to seek the death penalty for the murder on October 4, 1996. The trial began on March 23, 1998, and the jury found Carruthers guilty on all counts on March 27, 1998. The jury fixed the sentence for the malice murder at death on March 29, 1998. The trial court vacated the felony murder convictions by operation of law, see *Malcolm v. State*, 263 Ga. 369 (4) (434 SE2d 479) (1993); OCGA § 16-1-7, and sentenced Carruthers to death for the malice murder and to consecutive prison sentences of twenty years for theft by taking a motor vehicle, five years for possession of a knife during the commission of a crime against the person of another, and five years for possession of a firearm during the commission of the theft of a motor vehicle. Carruthers filed a motion for a new trial on April 14, 1998, and amended the motion on September 21, 1998, and again on January 19, 1999. The trial court denied the amended motion for a new trial on February 3, 1999. This appeal was docketed on June 24, 1999, and oral arguments were heard on September 22, 1999.

DNA consistent with Williams' blood was recovered from the automobile.

Viewed in the light most favorable to the verdict, we find that the evidence adduced at trial was sufficient to authorize the jury's finding Carruthers guilty beyond a reasonable doubt of the crimes of which he was convicted.[2]

*Closing Arguments in Sentencing Phase*

2. The United States Constitution and the Georgia Constitution guarantee criminal defendants the right to due process at trial. In addition, OCGA § 17-10-35 requires this Court to review the death sentence to determine whether it "was imposed under the influence of passion, prejudice, or any other arbitrary factor."

Carruthers filed a motion in limine to exclude during closing argument any Bible passages that appealed to the passion of the jury and would encourage it to impose a death sentence based on religion. During a pre-argument hearing, the prosecutor said that he intended to cite passages from the books of Romans, Genesis, and Matthew. The defendant objected to the biblical references, but the trial court overruled the objection and allowed the three passages.

During closing argument, the state urged the jury to impose a death sentence because the Bible states that society must deter criminals by taking the life of persons who kill other people. The state argued as follows:

> Now, ladies and gentlemen, let me talk to you a moment about some biblical references that help us in this case. Deterrence is very important and the Bible suggests to us why deterrence is appropriate. Romans tells us that every person is subject to the governing authority, every person is subject. And in Matthew it tells us, who sheddeth man's blood by man shall his blood be shed for in the image of God made [he] man.[3] For all they who take the sword shall die by the sword, and this is a message that is very clear, that society must deter criminals.

This Court has noted its concern about the use of biblical authority during closing arguments in death penalty trials. In *Hill v. State*,[4] we stated that "it would be improper to urge a death penalty based

---

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[3] This passage comes from the Book of Genesis. "Whoso sheddeth man's blood, by man shall his blood be shed: for in the image of God made he man." Genesis 9:6 (King James Version).

[4] 263 Ga. 37 (427 SE2d 770) (1993).

upon the defendant's religious beliefs, or to urge that the teachings of a particular religion command the imposition of a death penalty in the case at hand."[5] The problem is that biblical references inject the often irrelevant and inflammatory issue of religion into the sentencing process and improperly appeal to the religious beliefs of jurors in their decision on whether a person should live or die. Moreover, many passages in the Bible, Talmud, and other religious texts prescribe or command a sentence of death for killing. By quoting these texts during closing arguments, prosecutors may "diminish the jury's sense of responsibility and imply that another, higher law should be applied in capital cases, displacing the law in the court's instructions."[6] As a result, at least one state supreme court has adopted a rule prohibiting prosecutors from relying on any religious writing to support the death penalty during closing argument.[7]

Although we have long declined to disapprove of passing, oratorical references to religious texts in arguments by counsel,[8] we have distinguished those fleeting references from more direct references that urge that the teachings of a particular religion command the imposition of a death penalty.[9] In contrast to biblical law, Georgia law gives the jury the discretion to recommend life imprisonment or death, provides stringent procedures and safeguards that must be followed during the trial, and permits the jury to impose the death penalty only in limited circumstances.[10]

In addition, we have specifically disapproved of a prosecutor quoting verses from the Bible to support the death penalty. In *Hammond v. State*,[11] we concluded that it was improper for the assistant district attorney to argue that the defendant had violated the law of

---

[5] See id. at 45 (19); *Greene v. State*, 266 Ga. 439 (26) (469 SE2d 129) (1996); *Todd v. State*, 261 Ga. 766, 767-768 (2), n. 2 (410 SE2d 725) (1991); see also *Carr v. State*, 267 Ga. 547 (480 SE2d 583) (1997) ("references to religion which invite jurors to base their verdict on extraneous matters not in evidence should be avoided in prosecutorial argument").

[6] *People v. Wrest*, 13 Cal. Rptr. 2d 511, 839 P2d 1020 (1992).

[7] See *Commonwealth v. Chambers*, 599 A2d 630, 644 (Pa. 1991). See generally Brian C. Duffy, *Barring Foul Blows: An Argument for a Per Se Reversible-Error Rule for Prosecutors' Use of Religious Arguments in the Sentencing Phase of Capital Cases*, 50 VAND. L. REV. 1335 (1997).

[8] See *Western & Atlantic R. Co. v. York*, 128 Ga. 687, 688-689 (2) (58 SE 183) (1907) ("Counsel may bring to his use in the discussion of the case well-established historical facts and may allude to such principles of divine law relating to transactions of men as may be appropriate to the case."); *Greene*, 266 Ga. at 450 (same); *Crowe v. State*, 265 Ga. 582, 593 (18) (458 SE2d 799) (1995) (same); *Hill*, 263 Ga. at 45-46 (19) (same); *Conner v. State*, 251 Ga. 113, 122 (6) (303 SE2d 266) (1983) (same); see also *Christenson v. State*, 261 Ga. 80, 89-90 (7) (402 SE2d 41) (1991) (concluding that the prosecutor did not make impermissible argument in explaining retribution as "an eye for an eye and a tooth for a tooth").

[9] See *Hill*, 263 Ga. at 45-46; see also *Todd*, 261 Ga. at 768 n. 2 ("it would be improper to urge the imposition of a death sentence on the basis of a defendant's religious beliefs").

[10] See OCGA §§ 17-10-30 to 17-10-31.1.

[11] 264 Ga. 879, 886-887 (8) (452 SE2d 745) (1995).

God that "[w]hoever sheds the blood of man by man shall his blood be shed." Despite this disapproval and repeated admonitions,[12] prosecutors have continued to quote the Bible and urge its teachings, and trial courts have continued to permit the arguments.[13]

Unlike previous cases, however, where the defendants failed to object to the state's religious arguments at trial,[14] the defense in this case anticipated the argument and tried to prevent it by filing a motion in limine, but the trial court denied the motion. Because the defendant received an adverse ruling on his objection,[15] the standard of review in this case is not whether the improper argument in reasonable probability changed the result of the trial, but simply whether the argument was objectionable and prejudicial.[16]

It is difficult to draw a precise line between religious arguments that are acceptable and those that are objectionable,[17] but we conclude that the assistant district attorney in this case overstepped the line in directly quoting religious authority as mandating a death sentence. In citing specific passages, he invoked a higher moral authority and diverted the jury from the discretion provided to them under state law. One passage cited explicitly states that whoever sheds another person's blood shall have his own blood shed by man; another states that those "who take the sword shall die by the sword." The prosecutor was equally emphatic on the conclusion to be drawn from these passages: "this is a message that is very clear, that society must deter criminals." Language of command and obligation from a source other than Georgia law should not be presented to a jury.[18]

---

[12] See *Carr*, 267 Ga. at 556; *Hill*, 263 Ga. 45; *Todd*, 261 Ga. at 768 n. 2; see also *Greene*, 266 Ga. at 459-460 (Benham, C. J., dissenting) (religion should not be urged as a basis for a jury's sentencing decision in a death penalty trial); *Todd*, 261 Ga. at 774-776 (Benham, C. J., dissenting) (defendant's right to due process violated when prosecutor told jury to decide whether defendant should be executed on the basis of religious rather than legal principles).

[13] See *State v. Middlebrooks*, 995 SW2d 550, 559 (Tenn. 1999) ("We have condemned Biblical and scriptural references in a prosecutor's closing argument so frequently that it is difficult not to conclude that the remarks in this case were made either with blatant disregard for our decisions or a level of astonishing ignorance of the state of the law in this regard.").

[14] See *Carr*, 267 Ga. at 556; *Greene*, 266 Ga. 449; *Hammond*, 264 Ga. at 886; *Hill*, 263 Ga. at 45; *Todd*, 261 Ga. at 768.

[15] See *Weems v. State*, 269 Ga. 577, 579 (3) n. 3 (501 SE2d 806) (1998).

[16] See *Todd*, 261 Ga. at 767-768.

[17] See generally Elizabeth A. Brooks, Note, *Thou Shalt Not Quote the Bible: Determining the Propriety of Attorney Use of Religious Philosophy and Themes in Oral Argument*, 33 GA. L. REV. 1113 (1999).

[18] See *Jones v. Kemp*, 706 F. Supp. 1534, 1560 (N.D. Ga. 1989) (When "arguments come from a source, like the Bible, which 'would likely carry weight with laymen and influence their decision,' the effect may be highly prejudicial to the defendant, and the confidence in the reliability of the jury's decision which must guide imposition of the death penalty may be undermined."); see also *United States v. Giry*, 818 F2d 120, 133 (1st Cir. 1987) (such argu-

Therefore, we find that Carruthers' right to due process as secured by OCGA § 17-10-35, the Georgia Constitution, and the Constitution of the United States was abridged when the trial court allowed the inappropriate arguments from the Bible over objection. Because we cannot conclude beyond a reasonable doubt that the violation of Carruthers' state and federal constitutional rights was harmless, we reverse the jury's death sentence and remand the case for resentencing.

3. Carruthers challenges several other aspects of the state's closing argument as objectionable.

(a) We have often stated that a prosecutor may not express his or her personal opinion in closing argument.[19] To the extent that the assistant district attorney was stating his opinion regarding the fairness of Georgia's law governing victim impact testimony, we agree with Carruthers' contention that the comment was inappropriate.

(b) Because the issues could arise again at a retrial, we note with disfavor two other aspects of the state's argument during the sentencing phase. First, the state should not have argued that "only there [on death row] will [Carruthers] have the security that is appropriate for a man with his mentality." No evidence was before the jury regarding the relative security measures in various segments of Georgia's prison system, nor do we believe such evidence would have been appropriate. Second, the state misstated Georgia law regarding statutory aggravating circumstances. Only *one* statutory aggravating circumstance exists if a jury finds that a murder "involved torture, depravity of mind, *or* an aggravated battery"[20] or some combination of those three.[21] We disapprove of Division 22 in *Ledford v. State*[22] to the extent that it suggests that the three parts of the second component of subsection (b) (7) can support three separate aggravating circumstances involving the same victim.

(c) The trial court applied the wrong standard of review in denying Carruthers' motion in limine concerning the state's use of a meta-

---

ments are an "inflammatory appeal to the jurors' private, religious beliefs"); *Bussard v. Lockhart*, 32 F3d 322, 324 (8th Cir. 1994) (distinguishing between use of Bible text as "poetic version" of "common-sense" ideas and use that "invoke[s] the wrath of God" or "suggest[s] that the jury apply divine law" as an alternative to state law); *State v. Moose*, 313 SE2d 507, 519 (N.C. 1984) (disapproving arguments suggesting that to resist powers of the state is to resist God).

[19] See, e.g., *Wyatt v. State*, 267 Ga. 860, 863-864 (2) (485 SE2d 470) (1997).

[20] OCGA § 17-10-30 (b) (7) (emphasis supplied).

[21] See *West v. State*, 252 Ga. 156 (313 SE2d 67) (1984) (suggesting a proposed charge for the § (b)(7) statutory circumstance); *Hance v. State*, 245 Ga. 856 (268 SE2d 339) (1980) (in determining whether evidence supports finding of this statutory aggravating circumstance, evidence must be sufficient to satisfy the first major component and at least one sub-part of the second component).

[22] 264 Ga. 60, 70 (439 SE2d 917) (1994).

phor involving a Bengal tiger. In conducting its review, the trial court should consider not whether the argument would be considered reversible error on appeal but whether the argument is proper.

(d) Carruthers contends that the trial court erred in forbidding him to argue that his sentence should be considered in light of the plea bargain made between the state and Easter, the man Carruthers claimed was the real killer. While it is true that this Court's "statutorily mandated proportionality review of death sentences includes special consideration of the sentences received by co-defendants in the same crime,"[23] that review does not eliminate the jury's duty to consider all evidence properly before it in determining a just sentence. Where evidence of another's alleged culpability and plea arrangement has been set before the jury during the trial, it is appropriate for defense counsel to refer to that evidence in making an appeal to the jury's sense of fairness and mercy in a closing argument. Accordingly, we conclude that the trial court erred in forbidding such an appeal to the jury by defense counsel.

## *Pretrial Motions*

4. The trial court did not err in denying Carruthers' motion concerning alleged gender bias by the Clayton County District Attorney's office in its selection of cases in which to seek the death penalty. Carruthers concedes that, under this Court's and the United States Supreme Court's decisions, the burden rests on him to demonstrate that the decision makers in *his* case acted with discriminatory intent.[24] We find that Carruthers has failed to carry this burden.

5. The trial court did not err in denying Carruthers' pre-trial motion to suppress a statement he made during a search of his residence on June 17, 1996. Carruthers argues that the information contained in the affidavit used to obtain the search warrant was stale because the crime had occurred six months earlier. He also argues that the statement was made in response to unlawful interrogation.

The warrant authorized a search for a leather jacket, a handgun, and blood-stained clothing. The affidavit stated specifically that the affiant had interviewed Easter four days earlier and learned that on the night of the murder Carruthers had worn a leather jacket to conceal blood on him, had washed bloody clothes rather than discarding them, and had possessed a handgun. The affidavit further stated

---

[23] *Allen v. State*, 253 Ga. 390, 395 (8) (321 SE2d 710) (1984) (citing *Hall v. State*, 241 Ga. 252, 258-260 (8) (244 SE2d 833) (1978)).

[24] *McCleskey v. Kemp*, 481 U. S. 279, 292 (107 SC 1756, 95 LE2d 262) (1987); *Perkins v. State*, 269 Ga. 791, 794 (2) (505 SE2d 16) (1998); *Stephens v. State*, 265 Ga. 356, 356-358 (1) (456 SE2d 560) (1995).

that Carruthers had been incarcerated for most of the time since the murder, suggesting that he would have had a limited opportunity to dispose of the evidence.

The proper procedure for determining if the information relied upon in obtaining a search warrant is stale is "to view the totality of the circumstances for indications of the existence of reasonable probability that the conditions referred to in the sworn testimony would continue to exist at the time of the issuance of the search warrant."[25] After reviewing the totality of the circumstances, we conclude that sufficient evidence was before the magistrate to support a conclusion that there was a reasonable probability that the items to be seized remained in existence.

During the search of his residence, Carruthers made the spontaneous statement, "I got rid of that gun." We agree with the trial court that handing Carruthers a copy of the search warrant did not constitute interrogation.[26] Accordingly, we conclude that the trial court did not abuse its discretion in denying Carruthers' motion to suppress the statement.[27] Carruthers' statement did not constitute a confession, and, therefore, OCGA § 24-3-50 is inapplicable.[28]

### Guilt/Innocence Phase

6. Carruthers argues that evidence of his criminal conduct in the State of Florida after the murder was irrelevant to the jury's determination of his guilt in the crimes for which he was being tried and that the evidence was prejudicial in that it placed his character at issue. The disputed evidence includes testimony that Carruthers left the murder scene in the victim's automobile, traveled to Florida, stated that he had murdered a man and a woman, sold the automobile for illegal drugs, discovered the drugs were fake, threatened to blow up or burn the building of a man involved in the transaction, and chased and fired a handgun at that man. Evidence of a continuous criminal enterprise is admissible.[29] The evidence tended to show Carruthers'

---

[25] *Lewis v. State*, 255 Ga. 101, 104 (2) (335 SE2d 560) (1985); see *Illinois v. Gates*, 462 U. S. 213 (103 SC 2317, 76 LE2d 527) (1983); *State v. Luck*, 252 Ga. 347 (312 SE2d 791) (1984).

[26] See *Rhode Island v. Innis*, 446 U. S. 291 (100 SC 1682, 64 LE2d 297) (1980); *Cash v. State*, 224 Ga. 798, 799 (1) (164 SE2d 558) (1968); see also OCGA § 17-5-25 (requiring state to give a copy of the warrant to persons from whom anything is seized or to leave a copy in a conspicuous place).

[27] See *State v. Harris*, 256 Ga. 24, 25-26 (1) (343 SE2d 483) (1986); *Muff v. State*, 254 Ga. 45, 48 (2) (b) (326 SE2d 454) (1985); *Cunningham v. State*, 248 Ga. 835, 836 (2) (286 SE2d 427) (1982).

[28] See *Pressley v. State*, 201 Ga. 267, 270 (1) (39 SE2d 478) (1946); *Coates v. State*, 192 Ga. 130, 135 (1) (15 SE2d 240) (1941); *Allen v. State*, 187 Ga. 178, 180-181 (3) (200 SE 109) (1938).

[29] *Sears v. State*, 268 Ga. 759, 764 (11) (493 SE2d 180) (1997); *Todd v. State*, 261 Ga. at

motive for the murder, his exercise of unlawful dominion over the stolen automobile after the murder, and the relevance and weight of the testimony of many of the state's witnesses. Accordingly, we find that the trial court did not err in admitting the evidence.

7. The trial court did not err in denying Carruthers' motion for a mistrial when the state equated the terms "nickname" and "alias" in its opening statement. "The granting of a motion for a mistrial is within the discretion of the trial court, and the trial court's ruling will not be disturbed when the trial court has taken remedial measures sufficient to ensure a fair trial."[30] Assuming the reference to an "alias" was improper, we find that the trial court's curative instructions were adequate to address any harm created by the reference and, therefore, that the trial court did not err in refusing Carruthers' request for a mistrial.

8. During the state's direct examination of him, Easter was asked why he had not argued with Carruthers when Carruthers instructed him on how to help dispose of the victim's automobile. Easter responded by stating, "Like I say I knew that he had killed one person and I knew he'll probably kill again." The trial court sustained Carruthers' objection and gave a curative instruction. Later, Easter testified that he believed Carruthers "would have shot" a man at whom he had pointed a handgun. The trial court sustained Carruthers' objection and gave a curative instruction.

Carruthers argues that the trial court erred in denying his motions for a mistrial made in response to Easter's speculative statements. We find that the trial court's curative instructions were adequate to ensure a fair trial and, therefore, that the trial court did not abuse its discretion in denying the motions.[31]

9. Carruthers argues that the trial court erred in limiting his cross examination of the state's medical expert. Carruthers' counsel sought to ask a follow-up question of the witness concerning use of the term "mutilation" to describe the wounds inflicted on the victim's body. We agree that the question had not been fully and clearly answered by the state's witness and that the follow-up question was not unduly repetitious. However, upon our review of the trial as a whole, we find beyond a reasonable doubt that the denial of Carruthers' right to ask the disputed follow-up question was harmless, particularly because we are remanding the case for a resentencing trial and the question of mutilation was not relevant to Carruthers'

---

771; *Davis v. State*, 255 Ga. 598, 605-606 (9) (340 SE2d 869) (1986).

[30] *Wilson v. State*, 271 Ga. 811, 819 (13) (525 SE2d 339) (1999); see *Jones v. State*, 267 Ga. 592 (1) (b) (481 SE2d 821) (1997); *Cowards v. State*, 266 Ga. 191 (3) (c) (465 SE2d 677) (1996).

[31] See *Wilson*, 271 Ga. at 819.

defense during the guilt/innocence phase.[32]

10. The trial court did not err in admitting a photograph of a tattoo on Carruthers' body and allowing the tattoo to be presented to a witness for identification.[33]

11. Carruthers contends that the assistant district attorney committed a number of improprieties in his closing argument, including vouching for the credibility of a witness and commenting on the thoroughness of the state's investigation. While our review of the record reveals that certain statements may have transgressed the proper bounds of argument, we also note that Carruthers raised only two objections. One objection regarded the assistant district attorney's alleged mischaracterization of the defense's arguments. We find that this objection was properly overruled. The second objection regarded the assistant district attorney's allusion to Carruthers' threats to have Easter blamed for the murder, which we also find was properly overruled. Carruthers did not object at trial to the remaining contested statements; therefore, they can serve as grounds for reversal only if they in reasonable probability changed the result of the trial.[34] Because we conclude that they did not, we need not address the question of their alleged impropriety.

12. We find that the trial court's charge to the jury was consistent with the allegations set forth in the indictment and adequately set forth the elements and standards of proof applicable to each count of the indictment.[35]

Carruthers made written requests for jury charges on conspiracy, parties to a crime, and corroboration of accomplices' statements. We find no error in the trial court's charges on these subjects when Carruthers took active steps to ensure that the disputed charges were given and agreed to the particular wording chosen.[36]

13. The trial court responded to two written questions from the

---

[32] See *Chapman v. California*, 386 U. S. 18 (87 SC 824, 17 LE2d 705) (1967); *Garcia v. State*, 267 Ga. 257, 259 (7) (477 SE2d 112) (1996); *Byrd v. State*, 262 Ga. 426, 427-428 (2) (420 SE2d 748) (1992).

[33] See *Alexander v. State*, 239 Ga. 108, 110 (1) (236 SE2d 83) (1977) (an item of evidence is relevant and admissible if it has a tendency to establish a fact in issue).

[34] *Ledford v. State*, 264 Ga. 60, 67 (18) (439 SE2d 917) (1994); *Todd v. State*, 261 Ga. at 766 (2).

[35] See *Borders v. State*, 270 Ga. 804, 807 (1) (514 SE2d 14) (1999); *Franklin v. State*, 268 Ga. 865, 867 (2) (494 SE2d 327) (1998); see also *Dunn v. State*, 263 Ga. 343, 344 (2) (434 SE2d 60) (1993) ("This court on numerous occasions has held that a defendant may be convicted of felony murder under an indictment for malice murder where the underlying felony used to support the felony murder conviction is set forth in a separate count of the indictment or where the defendant is put on notice of the felony by the facts alleged in the indictment to show how the murder was committed.").

[36] See *Edmond v. State*, 267 Ga. 285, 287-288 (3) (476 SE2d 731) (1996); *Solomon v. State*, 247 Ga. 27, 31 (3) (277 SE2d 1) (1980); *Oglesby v. State*, 243 Ga. 690, 691 (1) (256 SE2d 371) (1979); *Patterson v. State*, 233 Ga. 724, 731 (7) (213 SE2d 612) (1975).

jury during their deliberations. We find that the response of the trial court accurately reflected the law and was not misleading. The jury's questions did not specifically request that the trial court repeat any specific charges. We conclude that the trial court did not abuse its discretion in its response to the jury's questions and in offering the jury the opportunity to request that specific charges be repeated.[37]

14. Easter testified for the state regarding Carruthers' conversations with two persons while in Florida. Carruthers argues that Easter's testimony about the conversations was inadmissible hearsay. The trial court ruled that the statements of the two persons were admissible simply because they were made in Carruthers' presence.

This Court has held that "a witness in a *criminal* trial may not testify as to a declarant's statements based on the acquiescence or silence of the accused."[38] However, we find that the statements of "Halfpint," the first person with whom Carruthers conversed, were admissible because Carruthers adopted them as his own by his responses.[39] Similarly, we find that all but one of the statements of the woman involved in the second conversation were admissible as substantive evidence because Carruthers directly responded to them in a manner that adopted their substance.[40] We find that the one remaining statement by the woman involved in the second conversation was harmless in light of the other strong and overlapping evidence presented at trial, including similar testimony by the woman herself.[41]

15. Carruthers contends that the trial court erred in ruling that a self-serving declaration made by him during his incarceration was inadmissible hearsay. The record reveals that defense counsel's question seeking the disputed testimony was withdrawn before the trial court had ruled on the state's objection, and, therefore, this issue has been waived.[42]

16. Because Carruthers did not object to the state's questions during the guilt/innocence phase regarding the circumstances of Carruthers' release on bond, the issue has been waived.[43] We need not

---

[37] See *Welch v. State*, 257 Ga. 197, 198 (1) (357 SE2d 70) (1987) (concluding there was no error in the court's failure to give the recharge when the jury did not request a specific recharge).

[38] *Jarrett v. State*, 265 Ga. 28, 29 (1) (453 SE2d 461) (1995); see *Luallen v. State*, 266 Ga. 174, 178 (5) (465 SE2d 672) (1996).

[39] See *Bundrage v. State*, 265 Ga. 813, 819-820 (3) (462 SE2d 719) (1995) (Sears, J., concurring specially); *Hall v. State*, 235 Ga. App. 44, 46 (3) (508 SE2d 703) (1998).

[40] See *Bundrage*, 265 Ga. at 819-820 (Sears, J., concurring specially).

[41] See *Woodard v. State*, 269 Ga. 317, 324 (4) (496 SE2d 896) (1998) ("The erroneous admission of the witness's hearsay statements is only reversible if it appears likely that the hearsay contributed to the guilty verdict.").

[42] See *Williams v. State*, 254 Ga. 6, 10 (3) (326 SE2d 444) (1985).

[43] See *Earnest v. State*, 262 Ga. 494, 495 (1) (422 SE2d 188) (1992).

address similar contested questions asked by the state during the sentencing phase because we are remanding for a new trial on sentencing.

## *Sentencing Phase*

17. Carruthers contends that the victim impact testimony of a psychiatrist who had treated the victim's child both before and after the murder was improper. The presentation of victim impact testimony in a death penalty trial is governed by OCGA § 17-10-1.2, and, therefore, Carruthers' reliance upon OCGA § 17-10-1.1 in support of his contentions is misplaced.[44] OCGA § 17-10-1.2 specifically authorizes testimony by persons "having personal knowledge of the impact of the crime on the victim, the victim's family, or the community." The challenged testimony in this case was based on the psychiatrist's personal knowledge of the impact on the victim's child. This knowledge was derived from the psychiatrist's professional association with both the child and his mother before the murder and with the child after the murder. Furthermore, the testimony was narrowly tailored in the manner set out in *Turner v. State.*[45] Under these circumstances, we conclude that the testimony was not improper.

18. We have previously held that it is not error for a trial court to decline to charge the jury on the specific mitigating factor of residual doubt so long as the jury is properly charged as to mitigating evidence in general.[46]

19. The jury recommended the death sentence for the murder, finding the following statutory aggravating circumstances: the murder was committed during the commission of an aggravated battery; the murder was committed during the commission of a burglary; the murder was committed during the commission of an armed robbery; the murder was committed for the purpose of receiving money or another thing of monetary value; and the murder was outrageously and wantonly vile, horrible, and inhuman in that it involved the torture of the victim and an aggravated battery against the victim. We find that the evidence presented at trial was sufficient to support the jury's finding beyond a reasonable doubt the existence of at least one statutory aggravating circumstance,[47] and, therefore, Carruthers will not be subjected to double jeopardy in a second jury trial for sentenc-

---

[44] See *Livingston v. State*, 264 Ga. 402 (1) (444 SE2d 748) (1994).

[45] 268 Ga. 213, 214-216 (2) (486 SE2d 839) (1997).

[46] See *Johnson v. State*, 271 Ga. 375, 385 (17) (519 SE2d 221) (1999); *Jenkins v. State*, 269 Ga. 282, 296 (25) (498 SE2d 502) (1998); *Taylor v. State*, 261 Ga. 287, 295 (11) (404 SE2d 255) (1991) ("It is well settled that a trial court is not required in its charge to 'identify mitigating circumstances offered by the defendant.' ").

[47] OCGA § 17-10-30 (b).

ing on his malice murder conviction.

20. Because we have remanded the case for a second jury trial on sentencing, we need not address the remaining contentions regarding the sentencing phase of the trial.

*Judgment affirmed in part and reversed in part. All the Justices concur, except Carley, J., who concurs in part and dissents in part.*

CARLEY, Justice, concurring in part and dissenting in part.

Although I concur fully in the affirmance of Carruthers' conviction of malice murder, I believe that the reversal of the death sentence in this case constitutes an unjustified deviation from controlling precedent. The trial court properly relied upon the previous pronouncements of this Court, the established legal principles of which the majority now implicitly disavows while ostensibly purporting to apply. In my opinion, either Carruthers' death sentence should be affirmed or the precedent which compels that result should be overruled. Because the majority does neither, I respectfully dissent to the reversal of the sentence.

Regardless of the rule in other jurisdictions, "[i]t is not and has never been the law of this state that religion may play no part in the sentencing phase of a death-penalty trial." *Greene v. State*, 266 Ga. 439, 449 (26) (469 SE2d 129) (1996), reversed on other grounds, 519 U. S. 145 (117 SC 578, 136 LE2d 507) (1996). Nothing in the Eighth Amendment or OCGA § 17-10-35 (c)

> forbids a death penalty based in part on an emotional response to factors in evidence which implicate valid penological justifications for the imposition of the death penalty. Perforce, argument by the prosecutor which "dramatically appeals" to such legitimate emotional response is not "constitutionally intolerable."

*Conner v. State*, 251 Ga. 113, 122 (5) (303 SE2d 266) (1983). See also *Greene v. State*, supra at 450 (26). According to the majority, "[i]t is difficult to draw a precise line between religious arguments that are acceptable and those that are objectionable . . . ." To the contrary, I submit that the dividing line has long been recognized in this state, and heretofore applied with little or no difficulty. In *Hill v. State*, 263 Ga. 37, 46 (19) (427 SE2d 770) (1993), this Court clearly held that, in Georgia, while it is improper to urge imposition of the death penalty based upon the defendant's religious beliefs or to argue that the teachings of a particular religion mandate the imposition of that sentence, the prosecutor nevertheless " ' "may allude to such principles of divine law relating to transactions of men as may be appropriate to the case." (Cit.)' [Cit.]" See also *Greene v. State*, supra at 450 (26);

*Crowe v. State*, 265 Ga. 582, 593 (18) (d) (458 SE2d 799) (1995); *Conner v. State*, supra at 122 (6).

It is true that, in our previous decisions applying this clear-cut distinction between proper and improper religious argument, the defendant did not object to the State's Biblical references. It is clear, however, that this lack of objection was, in each case, cited as an *alternative* basis for the ultimate conclusion that the trial court did not err in allowing the argument. In all of those opinions, this Court recognized the validity of the State's argument as the *primary* ground for concluding that there was no error. Thus, the prosecutor's closing argument in this case was not objectionable and prejudicial if it did not urge that Carruthers receive the death sentence because of his religious beliefs or in accordance with the mandate of any religious teachings, but merely cited Biblical authority to illustrate the secular justification for the death penalty as the appropriate punishment under the circumstances shown by the evidence.

The portions of the State's closing argument quoted by the majority clearly show that the prosecutor did not make any prejudicial reference to the Bible as a separate and independent source of authority for returning a death sentence against Carruthers. In fact, the assistant district attorney prefaced the argument by noting that the citation to Biblical references was for the sole purpose of assisting the jury in understanding "why deterrence is appropriate." "The State's role in the sentencing phase is to convince a jury that a particular defendant deserves the harshest punishment. [Cit.]" *Carr v. State*, 267 Ga. 547, 558 (8) (b) (480 SE2d 583) (1997). At least until today's decision, deterrence has always been a legitimate justification for imposition of the death penalty and, for that reason, a topic which prosecutors have been allowed to argue with considerable latitude in the sentencing phase of a capital case.

> [I]n most murder cases, considerations of neither general deterrence nor retribution will demand the imposition of the death penalty. . . . But that is not to say that a prosecutor may not urge vigorously that a death sentence *is* appropriate punishment in the case at hand, or that in so doing he may not remind the jury of the retributive and general deterrent functions of its verdict.

(Emphasis in original.) *Walker v. State*, 254 Ga. 149, 159 (14) (327 SE2d 475) (1985). Because deterrence is a legitimate topic for argument and the State is authorized to illustrate that concept by allusions to divine law, the prosecutor's argument couched in terms of Biblical references "suggest[ing] to us why deterrence is appropriate" was entirely proper. "It is just this type of argument that was found

to be authorized in *Hill* and *Crowe.*" *Greene v. State*, supra at 450 (26).

This Court must determine whether a death sentence was imposed under the influence of passion, but "the 'passion' proscribed by our law does not encompass all emotion, but only that engendered by prejudice, particularly racial prejudice, or other arbitrary factors. [Cits.]" *Conner v. State*, supra at 121 (5). Simply put, the majority reverses Carruthers' death penalty because the Assistant District Attorney made a passionate, but proper, argument and was successful in obtaining the maximum punishment for the murder of which Carruthers was convicted in this case. A reversal of the death sentence on this basis runs counter to the long-standing principle that

> "[t]he range of discussion (during closing argument) is wide — very wide. . . . [The prosecutor's] illustrations may be as various as are the resources of his genius; his argumentation as full and profound as his learning can make it; and he may, if he will, give play to his wit, or wing to his imagination." [Cit.] "Counsel may bring to his use in the discussion of the case well-established historical facts and may allude to such principles of divine law relating to transactions of men as may be appropriate to the case." [Cit.] Counsel for the [S]tate may forcibly or even extravagantly attempt to impress upon the jury "the enormity of the offense and the solemnity of their duty in relation thereto." [Cit.]

*Conner v. State*, supra at 122-123 (6). Here, the prosecutor used Biblical references only to illustrate the historical and moral underpinnings of deterrence as a justifying factor for imposing the death penalty. He did not improperly argue that Carruthers deserved to die for any reason other than that authorized under the secular law of this state. Instead, he made only an emotional exhortation that our contemporary reliance upon the deterrent effect of capital punishment has its roots in religious teachings. In the State's argument, the Bible did not supplant applicable statutes, but rather explicated those enactments. Compare *Hammond v. State*, 264 Ga. 879, 886-887 (8) (c) (452 SE2d 745) (1995) (argument that the defendant "violated the law of God").

In Division 3, the majority discusses additional aspects of the closing argument during the penalty phase, and concludes that Carruthers' objections have merit. I disagree. There was no error in the prosecutor's emotional but proper remarks. With regard to the argument of the defense counsel, the trial court properly allowed relevant argument concerning Easter's involvement in the crime, but also correctly disallowed argument that Carruthers should not receive the

death penalty because Easter did not. Carruthers' sentence is to reflect his own culpability, and the sentence imposed upon Easter, who did not commit the murder and who pled guilty to a lesser offense, is not a factor to be considered in the determination of the penalty that should be imposed on Carruthers.

In *Conner v. State*, supra at 122 (5), this Court noted that it had never "invalidate[d] a death penalty simply because the prosecutor made an impassioned argument to the jury during the sentencing phase of the trial." With today's opinion, that is no longer true. Henceforth, death sentences are subject to reversal if an emotional argument by the State does not satisfy the sensibilities of a majority of the Justices on this Court. I would continue to adhere to controlling precedent, which compels the conclusion that there was no error in the sentencing phase of this case. The Court should not reverse the death sentence which the jury imposed upon Carruthers.

DECIDED MARCH 6, 2000 —
RECONSIDERATION DENIED APRIL 13, 2000.

*John A. Beall, William S. Callahan,* for appellant.

*Robert E. Keller, District Attorney, D. Brandon Hornsby, Assistant District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Allison B. Goldberg, Assistant Attorney General,* for appellee.